IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CT-03371-M

JOHN SCOTT HUDSON,

        Plaintiff,

v.

J. LANEHART, et al.,

        Defendants.

ORDER

This cause is before the court on defendants' pending motion for summary judgment. Mot. [D.E. 50]. For the reasons discussed below, the court grants the motion.

Relevant Procedural History:

On December 15, 2020, John Scott Hudson ("plaintiff"), a state inmate proceeding without prepayment of fees, filed *pro se* a verified complaint under 42 U.S.C. § 1983 alleging violations of his Eighth and Fourteenth Amendment rights at Tabor C.I. from April 23, 2020, to December 3, 2020, and seeking declaratory relief and damages. Compl. [D.E. 1] at 3–9, 40; see [D.E. 2, 6].

On September 3, 2021, the court allowed Eighth and Fourteenth Amendment claims against Assistant Unit Manager J. Lanehart ("Lanehart") and Sergeant Butler ("Butler") (together, "defendants") to proceed in part, but dismissed other claims and defendants. See Order [D.E. 7].

On February 7, 2022, defendants answered the complaint, Answer [D.E. 17], and moved for the court to deem the answer timely filed, Mot. [D.E. 18].

On February 11, 2022, the court deemed the answer timely filed. Order [D.E. 21].

In a February 17, 2022, text order, the court denied plaintiff's motion for entry of default.

On July 14, 2022, the court, *inter alia*, denied plaintiff's motion to compel discovery and granted defendants' motion for an extension of time to complete discovery. Order [D.E. 32].

On May 15, 2023, defendants moved for summary judgment, Mot. [D.E. 50], and filed a memorandum [D.E. 51], a statement of facts [D.E. 52], and an appendix [D.E. 53]. The court notified plaintiff about the motion, the response deadline, and the consequences of failing to respond [D.E. 54] (citing Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam)).

On June 15, 2023, plaintiff filed a response in opposition to the motion for summary judgment, Pl.'s Resp. [D.E. 55], and an appendix [D.E. 55-1] (stating, *in toto*, "plaintiff submits to use all discovery and exhibits by counsel, and any other evidence to prove plaintiff's case [sic]").

Statement of Facts:

The facts are disputed as noted. In August 2016, plaintiff began receiving a "DC-490" for haircuts and shaves, alcohol-based cleaner for clippers, extra pillowcases, and "bio bags" for management of a skin condition of his head and face.[1] Compl. [D.E. 1] at ¶¶ 2–21.

On April 23, 2020, because he was "having an episode with his skin disease," plaintiff told Sergeant Floyd ("Floyd") he had a DC-490 for haircuts and shaves with a date of "3/21" for a "medical problem [that arose in] 2016." Id. at ¶¶23–24, 27. Floyd asked, "did he look stupid," and stated, "he could see [the date] was 3/21 and that he would handle it." Id. at ¶33. Floyd entered Lanehart's office, stating plaintiff was asking for a haircut based on an expired DC-490. Defs.' Stmt. Mat. Facts. [D.E. 52] at ¶4. "Lanehart contacted the facility medical staff and

---

[1] A "DC-490," A.K.A. a Medical Duty Status ("MDS"), is a written order of accommodations for an offender that "can only be valid[ated] or invalidated by a physician." Defs.' Stmt. Mat. Facts. [D.E. 52] at ¶¶5–7. The DC-490 "is entered into the OPUS system," officers can view the DC-490 "on the IP-51 screen," but "officers cannot change or modify the IP-51 screen." Id. at ¶¶8–9. Although plaintiff identifies his skin condition as "furunculosis and carbuncles," Compl. [D.E. 1] at ¶¶2–11, available medical records identify his skin condition as "hidradenitis suppurativa of face and scalp," see Defs.' App., Ex. J, [D.E. 53-11] at 1–2 (Apr. 28, 2020, clinical encounter).

2

verified that[,] according to their records, Plaintiff was given special haircut accommodations for 2 weeks due to a skin condition that expired on 03/21/2020."[2] Id. at ¶12. Lanehart met in his office with plaintiff to discuss this DC-490, id. at ¶13, but the parties disagree as to what occurred.[3]

On April 25, 2020, plaintiff observed "blood spots" on his pillowcase. Floyd responded to his cell and, when plaintiff showed Floyd the DC-490, Floyd threatened to put the DC-490 in the shredder if he presented it to Floyd again. Floyd took plaintiff to Nurse Brown who provided medical treatment. Nurse Brown told plaintiff "she was the nurse who stated that Dr. Tomlinson 3/21 [meant] haircuts and shaves for (2) two weeks [sic]." See Compl. [D.E. 1] at ¶¶38–42.

On April 28, 2020, plaintiff was seen by Dr. Hamoud and received a new DC-490.[4] Id. at ¶¶49–50. Plaintiff showed Assistant Unit Manager J. West ("West") the new DC-490 with the correction. West reviewed the document and told plaintiff that "haircuts and shaves for 490s" would be on Wednesdays or Thursdays and that he would receive one. Id. at ¶¶51–52.

---

[2] Plaintiff's Mar. 9, 2020, MDS listing, in "comments" section: "haircut and shave weekly until 3/21." Defs.' App., Ex. E, [D.E. 53-6]. Plaintiff alleges: Dr. Tomlinson stated, "everything on the '490' was for 2021 so a staff person would understand 3rd month, 21 year with no problem [sic]"; and "Dr. Tomlinson 'failed' in his obligation to 'correct' his unclear date and its meaning [3/21]." Compl. [D.E. 1] at ¶¶30, 32. Lanehart declares: as Tabor C.I. Green Unit Housing Manager, he supervised staff and managed day-to-day operations; "the DC-490 that was presented to me was dated 3/9/20 and stated that [plaintiff] was to receive haircut and shave weekly until 3/21"; "I called medical and asked if this meant March of 2021 as [plaintiff] claimed, or March 21st"; "Medical staff confirmed that the order was until March 21st[,] making it invalid at the time that [plaintiff] showed it to me"; and "I do not recall what nurse I spoke to in medical on the date of the initial incident." Defs.' App., Ex. 2, Lanehart Decl. [D.E. 53-13] at ¶¶2–5.

[3] Plaintiff alleges that: he explained his skin condition, noted he was "having [an] episode" of this condition, and asked for a shave and haircut to treat "the area," but Lanehart stated, "your 'ass' [plaintiff] ain't getting 'shit' on his unit with this mess [490] [sic]," threw the "490" across the desk, told plaintiff to leave, and made "no effort" to accommodate plaintiff's "recurring issue." Compl. [D.E. 1] at ¶¶34–37. Lanehart, by contrast, declares, in relevant part: after confirming with medical, he called plaintiff into his office and tried to explain that this DC-490 special accommodation had expired on Mar. 21, 2020; plaintiff "was advised to submit a sick-call request to be reevaluated if he felt he needed further accommodations"; plaintiff "became argumentative and loud"; Lanehart ordered plaintiff to exit the office and return to his pod, and plaintiff complied without further incident; and Lanehart did not "throw anything at" plaintiff or use profanity toward him. See Defs.' App., Ex. 2, Lanehart Decl. [D.E. 53-13] at ¶3.

[4] See Defs.' App., Ex. J, [D.E. 53-11] at 1–2 (Apr. 28, 2020, clinical encounter), Ex. H, [D.E. 53-9] (Apr. 28, 2020, Medical Duty Status listing, in "comments" section: "haircut and shave weekly until 4/28, 2021").

The parties dispute whether defendants "honored" plaintiff's DC-490,[5] whether they discriminated against him by allowing haircuts and shaves for other inmates with a DC-490,[6] and whether they were "deliberately indifferent" to his serious medical needs.[7]

---

[5] Plaintiff alleges, *inter alia*: circa Apr. 29, 2020, he gave the new DC-490 to Officer Carter to be added to the haircuts and shaves list; Carter told him "it was 'posted' in the Sgt.'s office not to honor plaintiff's 490"; Butler also told him "it was posted on the board in the Sgt.'s Office not to honor plaintiff's 490"; "Being that [ ] Lanehart 'posted' said 'instruction,' it brought 'direct knowledge' to Green Unit's Management Team"; and "This same '490' with the date 3/21 was honored by U.M. Brewer a week prior to moving to Green Unit from Blue Unit [sic]." Compl. [D.E. 1] ¶¶53–57; see Pl.'s Resp. [D.E. 55] at 8–9 (listing the date as Apr. 28, 2020). Plaintiff declares, *inter alia*: the Green Unit Management Team refused to "honor the corrected 490" and, once haircuts and shaves resumed for inmates without active 490s, Butler ordered him to sign the barber list like all other inmates. Pl.'s Decl. [D.E. 1-1] at ¶6. Butler declares, *inter alia*: he was a Green Unit sergeant; he "did not deny any offender with a valid DC-490 to receive a haircut from receiving a haircut"; on Apr. 24, 2020, plaintiff "tried to get a haircut with an expired DC-490 brought to [him] by Officer Carter"; plaintiff got a new DC-490 allowing haircuts; he did not deny plaintiff haircuts allowed under this updated DC-490; when an offender claimed an accommodation based on a DC-490, he verifies the validity of the DC-490 on the IP-51 screen on the computer; the IP-51 screen shows current DC-490 as entered by the medical provider; as nonmedical personnel, he "cannot create a DC-490 or modify a 490, either by allowing accommodations beyond what is listed nor by denying accommodations." Defs.' App., Ex. 3, Butler Decl. [D.E. 53-14] at ¶¶3–5. Lanehart declares, *inter alia*: "As to the allegation that [he] ordered staff, either verbally or via memo, not to honor a DC-490, this is simply untrue"; "At no time [has he] ever denied or ordered subordinate staff to deny an offender's medical accommodation"; he "honored all DC-490's as written"; although plaintiff alleges "that it was posted in the Sergeant's office not to honor his DC-490," he "never posted that"; "the valid 490's to be honored are kept on the IP-51 screen and cannot be altered by anyone other than medical and if medical alters it, it is updated in the system"; if he "send[s] any directives, [he] send[s] them through email to ensure documentation"; and he "did not send any emails directing staff to disregard a valid 490." Id., Ex. 2, Lanehart Decl. [D.E. 53-13] at ¶¶4, 6, 8.

[6] Plaintiff alleges, *inter alia*: five other Green Unit E-pod inmates received DC-490 haircuts and shaves, including an inmate transitioning from male to female; his DC-490 "has never been honored by [Green Unit Management Team which] has and continues to honor other inmate's '490' concerning haircuts and shaves"; on June 6, 2020, a Green Unit Management Team member told him that, because "his 490 was for once a week [shaves and haircuts], he could sign the barber list like all the other inmates"; and the Green Unit Management Team "showed 'intentional discrimination' by honoring other inmate's 490's with a 'designated' list, time, day, and area provided to care for their needs during Covid-19 but had 'direct' knowledge of [his] 490 but let him suffer in pain, and never made any accommodations for him [sic]." Compl. [D.E. 1] ¶¶60–64, 108–109, 114. Lanehart declares, *inter alia*: at the time in question, "all barber activity had been suspended by the governor's order due to the Covid-19 virus"; "The record on opus at the time as well as the paper copy presented by [plaintiff] indicated that the doctor's order had expired, and this was verified by medical staff"; and "Without valid documentation, [Lanehart] was under the governor's order to deny haircuts to all offenders and so was [his] staff." Defs.' App., Ex. 2, Lanehart Decl. [D.E. 53-13] at ¶¶3, 4.

[7] Plaintiff alleges, *inter alia*: he "has a 'skin disease' that causes pain and discomfort when not treated with recommendations [haircuts and shaves]"; "plaintiff was refused haircuts and shaves [due] to an 'error,' however, after the error was corrected Green Unit's Management Team has still showed 'deliberate indifference' in assisting with treatment [sic]"; and "'flare-ups' with his 'skin disease' became 'more active' during the time period between April 23, 2020 [through] July 2020 [due] to the Plaintiff being denied a treatment ordered by a doctor." Compl. [D.E. 1] ¶¶65–66, 106. Lanehart and Butler both declare, *inter alia*: they "did not interfere with or prevent any accommodations allowed to [plaintiff] under the 490"; "plaintiff "is just another inmate to" them; and they neither had any desire to cause plaintiff harm nor did anything to cause plaintiff harm. See Defs.' App., Ex. 2, Lanehart Decl. [D.E. 53-13] at ¶¶9–10, Ex. 3, Butler Decl. [D.E. 53-14] at ¶¶5–6.

4

Legal Standard:

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A court reviewing a motion for summary judgment should determine if a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

Discussion:

First, claims against defendants in their official capacities are barred by the Eleventh Amendment unless the state has waived immunity. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 66, 71 (1989). Because North Carolina has not waived immunity, defendants are entitled to summary judgment on any official capacity claims. See Anderson, 477 U.S. at 249.

Next, plaintiff's claims seeking declaratory or injunctive relief presumptively were mooted by his intervening prison transfer. See N.C. Dep't of Adult Corrections, Offender Pub. Info. https://webapps.doc.state.nc.us/opi/viewoffender.do?method=view&offenderID=0195399&searc

5

hLastName=hudson&searchFirstName=john&searchMiddleName=s&searchDOBRange=0&list url=pagelistoffendersearchresults&listpage=1 (search by inmate number) (visited Dec. 19, 2023) (noting plaintiff's transfer from Tabor C.I. to Bertie C.I. circa Mar. 29, 2023); see also Rendelman v. Rouse, 569 F.3d 182, 186 (4th Cir. 2009) ("[A]s a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there." (citation omitted)); Taylor v. Rogers, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986) (finding prisoner's request for injunctive relief mooted by intervening transfer). The court also does not discern that any exception to the mootness doctrine applies. Cf. City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983); Williams v. Ozmint, 716 F.3d 801, 809–10 (4th Cir. 2013).

The court now turns to plaintiff's surviving Eighth Amendment claims. The Eighth Amendment "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." Wilson v. Seiter, 501 U.S. 294, 296–97 (1991) (internal citation omitted). Deliberate indifference to a prisoner's serious medical needs violates the prisoner's Eighth Amendment rights. Estelle v. Gamble, 429 U.S. 97, 104 (1976); see Farmer v. Brennan, 511 U.S. 825, 835 (1994) ("[D]eliberate indifference entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."). "In order to establish a claim of deliberate indifference to a medical need, the need must be both apparent and serious, and the denial must be both deliberate and without legitimate penological objective." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999); see also Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (noting a plaintiff "must demonstrate that the officers acted with 'deliberate indifference' (subjective) to [his] 'serious medical needs' (objective)." (quotation omitted)).

6

When a prisoner alleges denial or delay of medical care, he must show the prison official knew of and disregarded an objectively serious condition, known medical need, or substantial risk of serious harm. Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016); see Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) (noting the subjective prong of a deliberate indifference claim requires proof of "actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by [the official's] action or inaction"). Beyond actual knowledge, the official "must also have recognized that his actions were insufficient to mitigate the risk of harm to the inmate." Iko, 535 F.3d at 241 (quotation marks and citation omitted).

The record reflects plaintiff's following contemporaneous clinical encounters. See Defs.' App., Ex. I, [D.E. 53-10] at 1, [D.E. 53-11] at 3 (Apr. 25, 2020, self-declared emergency with Nurse Brown, noting: as chief complaint, "bleeding"; as subjective complaint, "Offender complaining of bleeding from the back of his head"; an assessment of "skin integrity, risk for impaired[,] related to offender with history of obtaining skin infections to the back of his head on multiple occasions [sic]"; and stating, in "other," "Offender currently with no active bleeding noted. Offender requesting to have provider write an order so that he can shave weekly so he can maintain the areas hoping to prevent future infections"); id., Ex. J, [D.E. 53-11] at 1–2 (Apr. 28, 2020, with Dr. Hamoud, noting: as chief complaint, "skin problem"; as subjective complaint, *inter alia*, "Offender with history of hidradenitis suppurativa of face and scalp. Offender instructed by dermatologist to keep head and faced shaved to prevent infection. No current bleeding or signs of infection."; as to exam, "Scalp: Hypertrophic scarring of scalp in multiple areas without pustules or drainage or purulent or sanguineous fluid"; as to assessment, "Hidradenitis suppurativa . . . Current, Chronic, Not Improved/Same"; as to new medication orders, prescribing medications;

7

and, as to "disposition," "follow-up at Sick Call as Needed"); id., Ex. K, [D.E. 53-12] (June 16, 2020, with Dr. Hamoud, noting: as chief complaint, "skin problem"; as subjective complaint, "New skin boils on head and neck from not shaving enough. [History of] hidradenitis suppurativa. Has been unable to get twice weekly shaves despite 490 order. Asking for Magic shave."; as to exam, *inter alia*, "Skin: Nodules on scalp and below chin"; as to assessment, *inter alia*, "Hidradenitis suppurativa . . . Current, Chronic, Not Improved/Same," and "Local infection of the skin and subcutaneous issue, unsp . . . Current, Chronic, Not Improved/Same"; as to consultation requests, making a rush priority Utilization Review request of "Magic shave for offender with hidradenitis suppurativa who has flares of disease when his head and facial hair are not kept short. He is not being allowed more than one barber shave per week despite his MDS. This is required as therapeutic. He currently has new nodules on his scalp and neck. . . . Has been seen by UNC dermatology in the past, last 4/2018. Has been lost to follow-up. Due to chronic nature of his disease, he needs to return to clinic for assessment and further treatment options"; and, in other, "Antibiotics now for current flare. Will have offender return to UNC dermatology. UR for magic shave."); id., [D.E. 53-12] (June 11, 2020, with Nurse Singletary, noting: as chief complaint, "Skin Problem"; as subjective complaint, "I have these boils all over my face, neck, and head and I need the antibiotic again"; as to exam, skin tenderness, wound firmness with no signs or symptoms of infection, redness, or odor, and "nodules" with no drainage or follicular lesions; as an assessment, "Skin Integrity, Impaired[.] Boils noted to face, neck and head, no noted drainage, firm to touch"; and referring to provider).

The record also reflects plaintiff's contemporaneous DC-490 or Medical Duty Status ("MDS") forms sometimes, but not always, providing for weekly haircuts and shaves. See id.,

8

Ex. C, [D.E. 53-4] (Feb. 3, 2020, MDS not listing haircuts and shaves); id., Ex. D, [D.E. 53-5] (Mar. 9, 2020, MDS listing, in "comments," "haircut and shave weekly" with no expiration listed); id., Ex. E, [D.E. 53-6] (Mar. 9, 2020, MDS listing, in comments, "haircut and shave weekly until 3/21"); id., Ex. F, [D.E. 53-7] (Apr. 24, 2020, MDS not listing haircuts and shaves); id., Ex. G, [D.E. 53-8] (Apr. 25, 2020, MDS not listing haircuts and shaves); id., Ex. H, [D.E. 53-9] (Apr. 28, 2020, MDS listing, in "comments," "haircut and shave weekly until 4/28, 2021").

Plaintiff alleges, in relevant part, that Lanehart posted instructions in the sergeant's office not to "honor" plaintiff's DC-490 for haircuts and shaves, see Compl. [D.E. 1] at ¶¶55–56, and that "'flare-ups' with his 'skin disease' became 'more active' during the time period between April 23, 2020 [through] July 2020 [due to] being denied a treatment ordered by a doctor," id. at ¶106. Plaintiff also declares that, once haircuts and shaves resumed for inmates without active DC-490s, Butler ordered him to sign the barber list, like all other inmates. Pl.'s Decl. [D.E. 1-1] at ¶6.

Plaintiff did not have observable bleeding or symptoms of infection at his April 25 or 28, 2020, appointments, Defs.' App., Ex. I, [D.E. 53-10], Ex. J. [D.E. 53-11], and there is no record of medical treatment for skin complaints between April 28 and June 11, 2020. Although plaintiff subjectively attributes the boils on his head and neck to "not shaving enough" in his June 16, 2020, clinical encounter, the record also indicates he had been receiving one barber shave per week, as directed by the April 28, 2020, DC-490. See id., Ex. H, [D.E. 53-9], Ex. K, [D.E. 53-12].

Succinctly stated, plaintiff fails to satisfy the objective prong of a deliberate indifference claim because there is no showing that the consequences of defendants' alleged delay "honoring" his prophylactic DC-490 for weekly shaves and haircuts was objectively sufficiently serious. See Iko, 535 F.3d at 241 (noting "a 'serious . . . medical need' is 'one that has been diagnosed by a

9

physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention'" (citation omitted)); Grayson, 195 F.3d at 695; Strickler, 989 F.2d at 1379; see also Formica v. Aylor, 739 F. App'x 745, 755 (4th Cir. 2018) (per curiam) (unpublished) (noting, "where a deliberate indifference claim is predicated on a delay in medical care, [the Fourth Circuit has] ruled there is no Eighth Amendment violation unless 'the [treatment] delay *results* in some substantial harm to the patient,' such as a 'marked' exacerbation of the prisoner's medical condition or 'frequent complaints of severe pain.'" (quoting Webb v. Hamidullah, 281 F. App'x 159, 166–67 (4th Cir. 2008) (per curiam) (unpublished))).

Alternatively, even presuming the alleged delay "honoring" plaintiff's DC-490 for weekly shaves and haircuts was objectively serious, plaintiff still has not shown that defendants knew of, but disregarded, a substantial risk of serious harm. Farmer, 511 U.S. at 837, recognized their "actions were insufficient to mitigate the risk of harm," Iko, 535 F.3d at 241 (quotation marks and citation omitted), or acted with the requisite culpable state of mind, Strickler, 989 F.2d at 1379.

The court accepts as true plaintiff's claim that, had he earlier received requested shaves and haircuts, it would have been easier for Nurse Brown to "find the bleeding area" on April 25, 2020. Compl. [D.E. 1] at ¶47. Plaintiff, however, does not dispute Lanehart's declaration that, on April 23, 2020, medical staff informed him that plaintiff did not have a valid DC-490 for shaves and haircuts and he and his staff then were "under the governor's order to deny haircuts to all offenders." Defs.' App., Ex. 2, Lanehart Decl. [D.E. 53-13] at ¶4. Moreover, plaintiff ascribes confusion about the duration of the March 9, 2020, DC-490, permitting a "haircut and shave weekly until 3/21 [sic]," to Dr. Tomlinson's unclear order and an erroneous interpretation by Nurse Brown, who allegedly spoke to Lanehart on April 23, 2020. See Compl. [D.E. 1] at ¶¶30, 32, 42.

10

Although plaintiff alleges that Blue Unit staff previously allowed him haircuts and shaves under an expired DC-490, see id. ¶57, such permissiveness does not render Lanehart's denial of haircuts and shaves under an expired DC-490 deliberate indifference, particularly where, as here, pandemic-related shutdowns generally precluded barber visits, see Compl. Attach, Pl.'s Ex. 4, [D.E. 1-3] at 33 (May 7, 2020, Tabor C.I. medical department notice stating: "NC Governor ordered all salons to close, meaning no haircuts are allowed for anyone at this time. When the Governor lifts these restrictions, haircuts and shaves will resume."); see also Pearson v. Manlove, No. 20-CV-487-WMC, 2021 WL 1966601, at *2 (W.D. Wis. May 17, 2021) (finding inmate failed to allege facts showing plantar fasciitis treatment delays were unreasonable "when factoring in the unprecedented circumstances of the pandemic, in which ordinary citizens across the country, not just those in prisons, were being temporarily denied treatment for non-urgent health conditions").

The court presumes, without deciding, that, due to Lanehart's posted instructions not to "honor" his DC-490 in the Sergeant's office, defendants did not allow plaintiff a shave or haircut circa April 29, 2020, despite his new April 28, 2020, DC-490. See Compl. [D.E. 1] ¶¶53–56; Pl.'s Resp. [D.E. 55] at 12. However, the record reflects medical provider findings that plaintiff had no infection or active bleeding on April 25 or 28, 2020. See Defs.' App., Ex. I, [D.E. 53-10], Ex. J. [D.E. 53-11]. Defendants are not alleged to be medical providers, and generally are entitled to rely on provider expertise. See Iko, 535 F.3d at 242 ("If a prisoner is under the care of medical experts . . . a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands." (quotation omitted)). Although he alleges Floyd was "'familiar' with his boils because [Floyd] had worked on Blue Unit and Plaintiff had seen Blue Unit Staff concerning the same issue," Compl. [D.E. 1] at ¶27, plaintiff does not ascribe this knowledge to defendants or

11

contest either Lanehart's declaration that Lanehart did not have access to offender medical records or clinical notes, or defendants' declarations that they had no desire to cause him harm, see Defs.' App., Ex. 2, Lanehart Decl. [D.E. 53-13] at ¶¶9–10, Ex. 3, Butler Decl. [D.E. 53-14] at ¶6. Despite Dr. Hamoud's April 28, 2020, admonition that plaintiff could "follow-up at Sick Call as Needed," see Defs.' App., Ex. J, [D.E. 53-11] at 1–2, as noted above, the record does not indicate that he sought any follow-up treatment for his skin condition between his April 28 and June 11, 2020, medical appointments, see Webb, 281 F. App'x at 166–67 (noting a prior Fourth Circuit case found a delay in care claim insufficient where the inmate "did not present any information to his physician during the [delay] to indicate the situation was an emergency mandating immediate treatment" (citation and quotation marks omitted)). Plaintiff makes no showing, and the record also does not support any inference, that the risk of harm due to a missed prophylactic shave and haircut circa April 29, 2020, was or should have been apparent to laypersons like defendants. Cf. Scinto, 841 F.3d at 230; Jackson, 775 F.3d at 178; Iko, 535 F.3d at 241; see also McCoy v. Robinson, No. 3:08CV555, 2011 WL 5975277, at *8 (E.D. Va. Nov. 28, 2011) (granting summary judgment where inmate failed to demonstrate that a nurse actually perceived her isolated failure to provide prompt care for an infected boil and headaches posed a substantial risk of serious harm).

To the extent plaintiff instead alleges that defendants failed to ensure he had haircuts and shaves more often than once a week, as noted above, the June 16, 2020, clinical encounter indicates that plaintiff had been receiving one barber shave per week, as was directed by the DC-490 on April 28, 2020, see Defs. App., Ex. H, [D.E. 53-9], Ex. K, [D.E. 53-12], and defendants declare they did not deny plaintiff haircuts and shaves allowed under his active DC-490, id., Ex. 2, Lanehart Decl. [D.E. 53-13] at ¶9, Ex. 3, Butler Decl. [D.E. 53-14] at ¶5. The record does not

12

support an inference that defendants' failure to provide shaves and haircuts more frequently than the once-a-week accommodation under the April 28, 2020, DC-490, was deliberately indifferent. See Mohammed v. Beaver, No. 5:18-CV-00165-MR, 2021 WL 1147169, at *8 (W.D.N.C. Mar. 25, 2021) (finding no constitutional violation where defendants followed an MDS despite the inmate's requests for further accommodations), reconsideration denied, No. 5:18-CV-00165-MR, 2021 WL 4074479 (W.D.N.C. Sept. 7, 2021), and aff'd, No. 21-7404, 2022 WL 986679 (4th Cir. Mar. 31, 2022), and aff'd, No. 21-7404, 2022 WL 986679 (4th Cir. Mar. 31, 2022).

To the extent plaintiff newly claims that defendants are responsible for a total denial of all shaves and haircuts after he received his April 28, 2020, DC-490, see Pl.'s Resp. [D.E. 55] at 12 (stating Butler "did not honor" his DC-490 on April 30, 2020, "or any other haircut and shave day"), he may not amend his complaint through argument in opposition to defendants' motion for summary judgment, see Barclay White Skanska, Inc. v. Battelle Mem'l Inst., 262 F. App'x 556, 563 (4th Cir. 2008) (unpublished), and this "version of events is so utterly discredited by the record that no reasonable jury could have believed him," Scott, 550 U.S. at 379–80.

After viewing the record evidence and the reasonable inferences in the light most favorable to plaintiff, Scott, 550 U.S. at 378, defendants have shown the absence of a genuine issue of material fact as to plaintiff's deliberate indifference claims, Celotex, 477 U.S. at 325, whereas plaintiff fails to "come forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at 587 (emphasis and quotation omitted); see Anderson, 477 U.S. at 252 (noting the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment); see also Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003) (noting "neither '[u]nsupported speculation,' nor evidence

13

that is 'merely colorable' or 'not significantly probative,' will suffice to defeat a motion for summary judgment" (internal citations omitted)). Thus, defendants are entitled to summary judgment on these Eighth Amendment claims. See Anderson, 477 U.S. at 249.

The court now turns to plaintiff's surviving Fourteenth Amendment equal protection claim–that other, similarly situated inmates with DC-490s were given haircuts and shaves whereas plaintiff was placed on the same barber list as inmates without DC-490 accommodations. See Compl. [D.E. 1] at ¶¶60–64, 108–109, 114.

The Equal Protection Clause provides, *inter alia*: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." See U.S. Const. amend. XIV, § I. This clause "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001).

As noted above, Lanehart declares, and plaintiff does not dispute, that: at the relevant time, "all barber activity had been suspended by the governor's order due to the Covid-19 virus"; "The record on opus at the time as well as the paper copy presented by [plaintiff] indicated that the doctor's order had expired, and this was verified by medical staff"; and "Without valid documentation, [he] was under the governor's order to deny haircuts to all offenders and so was [his] staff." Defs.' App., Ex. 2, Lanehart Decl. [D.E. 53-13] at ¶¶3–4. As also noted above, Butler declares, and plaintiff does not dispute: when an offender claims an accommodation based on a DC-490, he verifies the DC-490's validity on the IP-51 screen on the computer; the IP-51

14

screen shows current DC-490s as entered by the medical provider; and, as nonmedical personnel, he "cannot create a DC-490 or modify a 490, either by allowing accommodations beyond what is listed nor [sic] by denying accommodations." Id., Ex. 3, Butler Decl. [D.E. 53-14] at ¶¶4–5.

Although plaintiff alleges his DC-490 was not "honored," but another inmate received at least three shaves per week, Compl. [D.E. 1] at ¶¶61–64, 108, the June 16, 2020, clinical encounter reflects he was receiving one barber shave per week, as allowed by his April 28, 2020, DC-490, see Defs.' App., Ex. H, [D.E. 53-9], Ex. K, [D.E. 53-12]; see also Compl. [D.E. 1] at ¶109 (indicating that Green Unit management team member was cognizant of his DC-490 for once-a-week shaves and haircuts).

Although he alleges a Green Unit management team member directed him to sign onto the barber list, like other inmates, whereas inmates with DC-490s received a "'designated' list, time, day, and area provided" for treatment, Compl. [D.E. 1] ¶¶109, 114, plaintiff fails to demonstrate that this purported disparate treatment "was a result of intentional or purposeful discrimination," cf. Morrison, 239 F.3d at 654; see Anderson, 477 U.S. at 252; Bouchat, 346 F.3d at 522.

After viewing the record evidence and the reasonable inferences drawn therefrom in the light most favorable to plaintiff, Scott, 550 U.S. at 378, defendants have met their burden of showing the absence of a genuine issue of material fact as to this equal protection claim, Celotex, 477 U.S. at 325, whereas plaintiff fails to "come forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at 587 (emphasis and quotation omitted). Thus, defendants also are entitled to summary judgment as to this claim. Anderson, 477 U.S. at 249.

Alternatively, because they are government officials, defendants are entitled to qualified immunity from civil damages so long as their "conduct does not violate clearly established

15

statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Defendants are entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. See Pearson v. Callahan, 555 U.S. 223, 236 (2009). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (alterations and quotations omitted).

Here, reasonable officials in defendants' positions would not have recognized that their actions violated plaintiff's clearly established rights. See id. at 743 ("When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" (citation omitted)); Malley v. Briggs, 475 U.S. 335, 341 (1986) ("The *Harlow* standard is specifically designed to . . . permit the resolution of many insubstantial claims on summary judgment . . . ."). Thus, defendants likewise are entitled to a finding of qualified immunity.

## Conclusion:

For the reasons discussed above, the court GRANTS defendants' motion for summary judgment [D.E. 50]. The clerk shall close the case.

SO ORDERED this 21st day of December 2023.

*Richard E. Myers II*

RICHARD E. MYERS II
Chief United States District Judge